# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01000-SCT

*RICHARD J. POOLE, ON BEHALF OF WRONGFUL DEATH BENEFICIARIES OF LINDA POOLE, DECEASED*

*v.*

*WILLIAM T. AVARA, M.D. AND SOUTH MISSISSIPPI SURGEONS, P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/2004 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JENNIFER P. BURKES |
| ATTORNEYS FOR APPELLEE: | MELINDA OWEN JOHNSON |
| | JOHN A. BANAHAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 08/11/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Today's case is before us as a result of the trial court's entry of a judgment for the defendants consistent with the jury verdict in this wrongful death/medical malpractice case. Finding no reversible error, we affirm the final judgment entered by the Jackson County Circuit Court.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     Linda Poole, a patient of Dr. William T. Avara, died in the early morning hours of March 27, 2001.  Dr. Avara's care of Linda Poole began in March of 2001, when Poole was admitted at Singing River Hospital in Pascagoula, Mississippi, with complaints of constipation and abdominal pain.  After diagnosing Poole with a gallstone condition, Dr. Avara surgically removed her gallbladder.  However, Poole continued to experience constipation and abdominal pain; and therefore, she returned to the hospital a few days later.  After discovering on this second hospital visit that Poole had an enlarged colon, Dr. Avara ordered a colonoscopy – an examination of the intestines requiring a bowel prep beforehand.  The bowel prep, which cleanses the bowel of stool, was unsuccessful. Poole was unable to take the bowel prep medication as she was still nauseous from the gall bladder surgery.  As a result, Poole's colon remained full of feces and bacteria.

¶3.     The colonoscopy revealed adenocarcinoma, a malignant, cancerous mass inside Poole's colon, which was blocking feces from passing through her colon.  This was the source of Poole's pain and constipation.  Dr. Avara surgically removed the mass from Poole's colon by cutting out the affected segment of the colon and then sewing the two ends of her colon back together – a procedure known as an anastomosis.

¶4.     A few days later Poole's condition worsened, and she died during attempts to resuscitate her.  An autopsy revealed leakage of feces and bacteria into Poole's abdomen from a tear of the surgical seam or suture on her colon.  It is at this point of the thus-far stated factual scenario that the plaintiff and the defendants part ways.  Poole's beneficiaries assert

2

that Dr. Avara improperly and imprudently performed the anastomosis and that, as a result, the surgical seam had been leaking for hours prior to Poole's death. Poole's beneficiaries further allege that the slow leak resulted in peritonitis – inflammation of the peritoneum (which is a smooth serous membrane lining the abdominal cavity) and that this peritonitis was the cause of death. On the other hand, Dr. Avara asserts that the leakage occurred as a result of cardiopulmonary resuscitation (CPR) S that the pressure applied to Poole's chest during resuscitation, combined with the air pumped into her body by an ambu bag, caused the surgical seam to pop open. Further, Dr. Avara opined that the seam had simply not been opened long enough to cause peritonitis.

¶5. Poole's beneficiaries contend that the proper surgery for Dr. Avara to have performed was not an anastomosis, but a colostomy – a procedure whereby the colon is connected to the surface of the abdomen, allowing feces to be deposited into a bag until the colon heals enough for a surgeon to later perform an anastomosis. Conversely, Dr. Avara asserts that the anastomosis was proper and that the CPR pressure caused the tear.

¶6. Richard J. Poole, Linda Poole's husband, filed this medical negligence lawsuit against Dr. Avara and his medical group, South Mississippi Surgeons, P.A., on behalf of all of Linda's wrongful death beneficiaries in the Circuit Court of Jackson County, Mississippi. The jury found for the defendants, and the circuit court thereafter entered a final judgment consistent with the jury verdict. In due course, the circuit court denied the plaintiff's post-trial motion for a judgment notwithstanding the verdict, or in the alternative, motion for a new trial. It is from this order denying post-trial motions that Richard Poole now appeals to this Court.

3

¶7.    On appeal, Poole's beneficiaries raise six issues, specifically, whether the trial court erred in: (1) overruling Poole's *Daubert/McLemore* challenge: (2) permitting the defense to argue a new cause of death for the first time at trial; (3) permitting a physician associated in business with Dr. Avara to testify as an expert witness for Dr. Avara; (4) excluding the deposition of a witness who was more than 100 miles away and out-of-state; (5) denying Poole's motion for a judgment notwithstanding the verdict; and, (6) denying Poole's motion for a new trial.

## DISCUSSION

### I.    THE *DAUBERT/McLEMORE* RULING

¶8.    The standard of review for the admission or suppression of evidence in Mississippi is abuse of discretion. *Miss. Transp. Comm'n v. McLemore*, 863 So.2d 31, 34 (Miss. 2003). The trial judge has the sound discretion to admit or refuse expert testimony; an abuse of discretion standard means the judge's decision will stand unless the discretion he used is found to be arbitrary and clearly erroneous. *Id.* This is the standard for the first four issues in this case, as all deal with the admission or suppression of evidence by the trial court.

¶9.    The first question is therefore whether the trial judge's discretion in allowing defense expert testimony on the cause of the torn anastomosis seam was arbitrary and clearly erroneous. This goes to the primary issue of whether the expert testimony allowed at trial was both relevant and reliable. Stated another way, this Court must now determine whether the testimony was so irrelevant and unreliable that the trial judge's decision to allow it was

4

arbitrary and clearly erroneous. The Mississippi rule of evidence allowing expert testimony is identical to its counterpart in the Federal Rules of Evidence, and reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.

¶10. Under the authority of this rule, Dr. Avara offered expert testimony that CPR and resuscitation caused the anastomosis on Poole's colon to tear to rebut evidence that the tear was a result of Dr. Avara's negligent decision to perform the anastomosis. Before trial, Poole's beneficiaries moved to exclude this testimony under the United States Supreme Court ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993). *See* Miss. R. Evid. 702, as amended by this Court on May 29, 2003.

¶11. In *Daubert*, the United States Supreme Court rejected the "general acceptance" test for scientific expert testimony then in place. For years, in federal courts, the standard had been that scientific theories offered by expert witnesses at trial had to enjoy general acceptance in their respective fields to be admissible. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The *Frye* court had held, "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance

5

in the particular field in which it belongs." *Id.* The high Court relaxed this standard for federal practice in *Daubert*, stating that the Federal Rules of Evidence, specifically Rule 702, superceded *Frye* because they were enacted after that decision. 509 U.S. at 589. Interpreting the language of Rule 702, which at that time did not include the three numbered restrictions, the Court held that scientific expert testimony need be only relevant and reliable under the rules. *Id.* The Court emphasized the liberal thrust of the rules and the general approach of the rules to relax traditional barriers to opinion testimony. *Id.* at 588. Thus, the two-pronged *Daubert* test was born and remains in place governing admissibility of scientific expert testimony under Rule 702 today.[1]

¶12.    Now, of course, our Rule 702 has three additional requirements put in place after both *Daubert* and *Kumho Tire*: The testimony must be based upon sufficient facts or data; the testimony must be the product of reliable principles and methods; and, the witness must have applied the principles and methods reliably to the facts of the case. Miss. R. Evid. 702. When put to this test, Dr. Avara's expert testimony arguably appears to be inadmissible. Poole's beneficiaries argue that (1) the testimony is not based upon sufficient facts or data - the only certain fact is that the suture burst, not what the cause of the burst was; (2) the testimony is not the product of reliable principles and methods, at least none that have been conclusively published in medical journals according to all of the witnesses; and, (3) the witnesses did not

---

[1]A few years later, the Court expanded on the *Daubert* opinion in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed. 2d 238 (1999). The Court held that the two-part test applies to any type of expert testimony, not just scientific expert testimony. *Id.* at 147.

6

apply the principles and methods reliably to the facts of the case, because no reliable principles and methods exist to support this theory.

¶13. The *Daubert* Court considered four general questions in determining the admissibility of expert testimony, namely (1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and, (4) whether the theory or technique has general acceptance. 509 U.S. at 593-94. This Court, in *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31, 35 (Miss. 2003), adopted the rule in *Daubert*, as modified by *Kumho Tire*, holding that the general acceptance test set forth in *Frye* no longer governed the admissibility of expert witness testimony in Mississippi. The chief complaint of Poole's beneficiaries is that Dr. Avara's theory in this case, that CPR caused the seam on Poole's anastomosis to tear, is novel and therefore has not been widely subjected to peer review and publication, if at all, and cannot have general acceptance by virtue of its novelty. Poole and the other beneficiaries carefully reason through each of these four considerations and argue that the CPR theory fails all of them, concluding that the trial court should not have allowed the testimony putting forth this theory. If these four considerations were the beginning and the end of the analysis, Poole would perhaps be right. However, we must go further.

¶14. Of significant import is the fact that the list provided in *Daubert* is *not* exhaustive. One assertion by Poole in the appellant's brief, however, is completely contrary to the actual language of our reading of *Daubert*. Poole asserts that "*Daubert* provided an exhaustive list

7

of factors for determining the reliability of expert testimony," while our opinion in *McLemore* clearly states that "It is important to note ... that the factors mentioned in *Daubert* do not constitute an exclusive list of those to be considered in making the determination: *Daubert*'s 'list of factors was meant to be helpful, not definitive.'" 863 So. 2d at 39 (quoting *Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167). Looking to the Fifth Circuit for guidance, the Court re-emphasized that the *Daubert* list is illustrative, but is not exhaustive. *Id.* at 38 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5ᵗʰ Cir. 2002)). Mississippi is not unique in its interpretation of *Daubert*. The *Daubert* Court itself did not claim it was rigidly defining elements required for expert testimony to be admissible, but rather providing only "general observations" it deemed appropriate. 509 U.S. at 593. Indeed the Court stated, "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." *Id.* A later look at *Daubert* by the U.S. Supreme Court provided the same result, concluding that "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . . Too much depends upon the particular circumstance of the particular case at issue." *Kumho Tire*, 526 U.S. at 150. That Court went on to state that "It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review." *Id.* at 151.

¶15. With these guidelines, and the text of Rule 702, the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable. *Kumho Tire*, 526 U.S. at 147. Relevance of expert testimony means it will, according to the Rule, assist the trier of fact.

*Daubert*, 509 U.S. at 591. This offered testimony is clearly relevant and indeed, Poole's beneficiaries do not dispute its relevance here. Reliability, as we have seen, is part of an inquiry under Rule 702, which is unquestionably flexible. *Id.* at 594. The question goes partly to the Rule's wording, "scientific . . . knowledge." *Id.* at 589. Scientific knowledge means something more than unsupported speculation of subjective belief that is grounded in methods and procedures of science. *Id.* at 590. Certainly the witnesses' testimony here is not mere conjecture akin to astrology or something of the sort; the testimony is a medical opinion on what caused the suture to tear open. Whether CPR actually tore open the suture is not entirely certain. Requiring that the subject of expert testimony be known to a certainty is not necessary either, however, because, as the *Daubert* Court pointed out, "there are no certainties in science." *Id.* Though the *Daubert* factors are meant to be helpful, the application of those factors "depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *McLemore*, 863 So. 2d at 37.

¶16. The next step, therefore, is to look more closely to these considerations in this specific case. Looking at the nature of the issue, the expert's particular expertise, and the subject of the testimony, the trial judge must determine whether the expert testimony was both reliable and relevant. The nature of the issue is not dispositive of the case here, but instead, it goes to Dr. Avara's theory of what caused the suture to tear open, and not necessarily to rebut any one element of the negligence claim. The testimony is not defining, for example, the standard of care; rather, the subject of the testimony again goes to the cause of the tear. With regard to

9

the expertise of the witness, Poole's beneficiaries do not dispute the qualifications of the witnesses. The rule is that the expert must exercise the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *McLemore*, 863 So. 2d at 37-38. At least one defense witness did testify that he knew of an instance where a stomach burst in similar circumstances and the other witnesses based their testimony on probability. "Unlike an ordinary witness ... an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. This Court has given that same latitude to experts. "Absent other grounds to exclude, an expert's testimony is presumptively admissible when relevant and reliable." *McLemore*, 863 So. 2d at 39.

¶17. Poole's beneficiaries claim amazement that this theory had never been the subject of peer review, but that is simply not enough to exclude expert testimony. Again, the U.S. Supreme Court declared that "It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review." *Kumho Tire*, 526 U.S. at 151. Perhaps this theory has simply not previously interested any scientist. *Id.* Peer review by publication remains only one factor on a non-exhaustive list of factors for admissibility under evidence rules with a liberal thrust. Though helpful when present, publication and peer review are not absolutely required; their absence does not constitute automatic inadmissibility. Simply because no author had written specifically on the theory of bursting an anastomosis seam through CPR does not mean it is truly ground-breaking medical

10

history. Besides, Poole's beneficiaries had the benefit of attacking the evidence at trial. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

¶18. The testimony was based on scientific knowledge which would assist the trier of fact to understand or determine a fact at issue. *Daubert*, 509 U.S. at 592. It was the jury's role to take both sides of the testimony, give each its appropriate weight, and decide the case after hearing all of the evidence. When considering the liberal thrust of the rules of evidence and the qualifications of the witnesses, we cannot find that the trial judge abused his gatekeeping discretion by allowing the jury to hear the expert testimony, even concerning a theory which currently enjoys no peer review. For these reasons, we find that the trial court did not err in allowing the jury to hear this testimony.

## II. TRIAL BY AMBUSH

¶19. This issue, and the next two issues which follow, share the same standard of review as the first issue above. That standard for the admission or suppression of evidence is abuse of discretion. *McLemore*, 863 So.2d at 34. Poole's beneficiaries claim that Dr. Avara raised for the first time at trial the possibility that the cause of death was placement of the central line in Poole's neck and that this constituted unfair surprise and trial by ambush. The purpose of the strict discovery rules is indeed to avoid trial by ambush and to ensure that all parties involved have a reasonable time for trial preparation. *Haggerty v. Foster*, 838 So. 2d 948, 959

11

(Miss. 2002). The Rules promote fair trials. *Id.* "Once an opponent requests discoverable material, an attorney has a duty to comply with the request regardless of the advantage a surprise may bring." *Id.*

¶20. However, this is not a case of requesting discoverable material. The theory that the cause of death may have been something other than peritonitis goes to trial strategy. The Rule does not command parties to disclose trial strategies to each other. The possibility that the central line contributed to Poole's death came up earlier during these events when Poole's family members contacted the coroner, which information was readily available in discoverable materials to which all attorneys here had access. This is sufficient notice for the Poole beneficiaries' attorney to prepare for trial. The attorney's clients, after all, were involved in discussions concerning this possibility. Additionally, as defense counsel correctly points out, Poole's attorney was required to object contemporaneously at trial to this evidence in order to preserve it as a claim of trial court error. Miss. R. Evid. 103(a)(1). Poole's attorney failed to do this. Again, we cannot find that the trial judge abused his gatekeeping discretion by allowing the jury to hear the expert testimony. Thus, this issue is without merit.

### III. EX PARTE COMMUNICATION

¶21. Poole's beneficiaries' next contention is that the trial court should not have allowed Dr. Avara to use Dr. Martin Bydalek as an expert witness because doing so violates the rule we set out in *Scott ex rel. Scott v. Flynt*, 704 So. 2d 998 (Miss. 1996), which reiterated that the pleadings exception to Miss. R. Evid. 503(f) does not allow ex parte contact by an opposing

12

party for the purposes of discovering confidential physician-patient communications. Dr. Avara's use of a business associate as an expert witness, while questionable, does not violate this rule. Miss. R. Evid. 503(b) gives a patient the right to prohibit his/her physician from disclosing confidential communications pertaining to diagnosis or treatment and knowledge which the physician has by virtue of his/her professional relationship with the patient. Miss. R. Evid. 503. Dr. Avara, Poole's treating physician, did not disclose any information of this type. Dr. Bydalek was retained as an expert, but not to give testimony on information protected under this rule. The privilege "must be limited to its language and clear purpose and should not be extended by construction." *G., M. & N. R. Co. v. Willis*, 171 Miss. 732, 157 So. 899, 901 (1934). This assignment of error is therefore without merit.

## IV. USE OF A WITNESS' DEPOSITION AT TRIAL

¶22. Prior to trial, the defendants took the discovery deposition of Dr. Mark Campbell, one of Poole's experts, in Grand Rapids, Michigan. Dr. Campbell was unable to travel from Michigan to Mississippi to testify live at the trial. Poole attempted to have Dr. Campbell's deposition testimony read to the jury during the trial; however, the trial court sustained defense counsel's objection to this testimony on the basis that Poole failed at the deposition to attempt to qualify and tender Dr. Campbell as an expert witness.

¶23. Miss. R. Civ. P. 32(a)(3)(B) allows a party to use the deposition of a witness if the witness is either out of state or more than 100 miles away from the place of trial. Miss. R. Civ. P. 32. A trial judge should allow deposition testimony on these grounds, so long as such testimony is otherwise admissible and not objectionable. However, Dr. Avara did object at

13

trial to this testimony pursuant to Miss. R. Civ. P. 32(b), challenging the witness' competence as an expert. The Rule provides that a party may object to the use of a deposition at trial on the same grounds that party would have if the witness were present and testifying at trial. Miss. R. Civ. P. 32. If the witness had been present at trial, Dr. Avara would have had just as much right to object to the expert's testimony on the grounds that the expert was not qualified. Excluding the testimony was proper on these grounds of objection; therefore, for these reasons, we find this issue to be without merit.

## V. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

¶24. The standard of review in considering a trial court's denial of a motion for judgment notwithstanding the verdict is de novo. *Wilson v. Gen. Motors Acceptance Corp.*, 883 So.2d 56, 64 (Miss. 2004). The trial court must view the evidence in the light most favorable to the non-moving party and look only to the sufficiency, and not the weight, of that evidence. *Id.* at 63. Here, when considering all of the evidence in the light most favorable to Dr. Avara, if such evidence were insufficient to uphold the verdict, the trial court must grant the motion for a j.n.o.v. Poole's beneficiaries claim through this motion that the evidence, when taken as a whole, and when viewed in the light most favorable to Dr. Avara, will leave no reasonable doubt in the jury's minds that Dr. Avara was negligent. They claim that the verdict was against both the weight and the sufficiency of the evidence. That weight and sufficiency of the evidence are not synonymous bears repeating both here and in the final issue below. Our recent opinion in *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005), discussed sufficiency versus weight of the evidence. When determining whether the evidence was *sufficient*, the critical inquiry is

14

whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions. *Jesco, Inc. v. Whitehead*, 451 So.2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring). When looking at all of the evidence, even that which Poole's beneficiaries argued was objectionable, we cannot say that the jury could have only properly found for Poole's beneficiaries. Conflicting evidence exists which could cause fairminded jurors to reach different conclusions and thus, granting this motion would have been improper. Therefore, this issue is without merit.

## VI.    MOTION FOR A NEW TRIAL

¶25.    The standard of review in considering a trial court's denial of a motion for a new trial is also abuse of discretion.

> We discuss these two issues simultaneously as the standards of review are identical. "A new trial may be granted pursuant to Miss. R. Civ. P. 59. A new trial may be granted in a number of circumstances, such as when the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice. This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion. The existence of trial court discretion, as a matter of law and logic, necessarily implies that there are at least two differing actions, neither of which if taken by the trial judge will result in reversal."

*Shields v. Easterling*, 676 So. 2d 293, 298 (Miss. 1996) (quoting *Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass'n*, 560 So.2d 129, 132 (Miss. 1989)).

¶26.    Poole's beneficiaries request the alternative remedy that they be granted a new trial (that is if this Court were not to grant the first requested remedy to reverse and remand for damages only) because the verdict was contrary to both the weight and sufficiency of the

15

evidence. Again, the Poole beneficiaries confuse weight of the evidence with sufficiency of the evidence. In a motion for a new trial, this Court will overturn the verdict only when it is against the overwhelming weight of the evidence. ***Bush v. State***, 895 So. 2d at, 844. Stated differently, we will not set aside a jury's verdict and order a new trial unless we are convinced that the verdict was contrary to the substantial weight of the evidence so that justice requires that a new trial be granted. ***Jesco***, 451 So.2d at 714 (Robertson, J., specially concurring). Here, we simply cannot find that the verdict was against the *overwhelming* weight of the evidence; though all of the evidence may not point automatically to a verdict in Dr. Avara's favor, it cannot on the other hand be said that the weight of the evidence was overwhelmingly against Dr. Avara. The trial court's denial of this motion was proper. Accordingly, we find this issue to be without merit.

## CONCLUSION

¶27. The trial court committed no reversible error in admitting the defense testimony or refusing to admit the deposition of Dr. Campbell. Only if the trial judge's discretion in making these decisions was arbitrary and clearly erroneous, would reversal be proper. Because the purpose of the ***Daubert/McLemore*** rule was to exclude expert testimony which is mere conjecture, and to admit expert testimony of scientific knowledge which will assist the trier of fact, its purpose is served here. The testimony challenged under ***Daubert/McLemore*** was not mere conjecture, but rather opinions expressed by experts whose qualifications Poole's beneficiaries did not question. Dr. Avara's use of the theory that the cause of death was due

16

to the placement of the central line did not constitute unfair surprise or trial by ambush. The use of Dr. Bydalek did not violate the physician-patient privilege. Because Dr. Avara had sound objections to Dr. Campbell's testimony which most definitely could have been appropriately made had Dr. Campbell been personally present to testify at trial, the trial court did not err in refusing his testimony to be read into evidence. Further, the jury's verdict was not contrary to the sufficiency of the evidence or the overwhelming weight of the evidence, thus making the trial court's denial of the Poole beneficiaries' post-trial motions proper.

¶28.    For these reasons, we affirm the final judgment entered by the Circuit Court of Jackson County consistent with the jury verdict in favor of the defendants.

¶29.    **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND DICKINSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

17